Filed 6/2/26  Chorba v. The Regents of the U. of Cal. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN CHORBA,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>　　　　Defendant and Respondent. | A172615<br><br>(San Francisco City & County Super. Ct. No. CPF-24-518678)<br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

**BY THE COURT**:

It is ordered that the opinion filed herein on May 8, 2026, be modified as follows:

1.  On page 50, footnote 12:  The sentence beginning "UCSF's statement is presumably referring to the Pride Hall space . . . ," is modified to read:

> UCSF's statement is presumably referring to the Pride Hall space—which it found adequate but which Chorba rejected— while also referencing Chorba's opinion that the BCH Oakland space is inadequate for his needs.

1

There is no change in the judgment.

The petition for rehearing is denied.

Dated: _____

Banke, Acting P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JOHN CHORBA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>     Defendant and Respondent. | A172615<br><br>(San Francisco City & County Super. Ct. No. CPF-24-518678) |

Plaintiff and appellant Dr. John Chorba has long been at odds with defendant and respondent University of California San Francisco (UCSF) regarding the adequacy of the research laboratory facilities and equipment afforded him.  The instant matter arises from the denial of two grievances, which he judicially challenged by way of a petition for traditional and administrative mandamus.  (Code Civ. Proc., §§ 1085, 1094.5.) [1]  The trial court denied both forms of writ relief.

Dr. Chorba raises four issues on appeal: the trial court applied an incorrect standard in rejecting his administrative mandamus claim; the administrative record does not support the denial of his grievances; the

_____

[1]  All statutory references are to the Code of Civil Procedure unless otherwise specified.

grievance process was unfair and violated his due process rights; and the trial court erred in denying traditional mandamus relief, ruling UCSF does not have "a clear, mandatory, ministerial duty" to provide him with the laboratory facilities and equipment he seeks. We affirm.

## BACKGROUND

Defendant and respondent Regents of the University of California (the Regents) own and operate UCSF, a medical complex, research center, and professional school in San Francisco. (*Regents of University of California v. Superior Court* (2024) 102 Cal.App.5th 852, 856.)

Dr. Chorba is an associate professor in residence in the Division of Cardiology at Zuckerberg San Francisco General Hospital (ZSFG), within the Department of Medicine. He is a board-certified clinical cardiologist and a research-based physician-scientist.

Since he has been affiliated with UCSF, Dr. Chorba has received grant funding for his research from several entities, including the National Institutes of Health (NIH). UCSF officials participated in the preparation of the NIH grant applications, certifying "the organization will comply with all applicable assurances and certifications referenced in the application . . . [and] the applicant organization has the ability to provide appropriate administrative and scientific oversight of the project and agrees to be fully accountable for the appropriate use of any funds awarded and for the performance of the grant-supported project or activities resulting from the application." (NIH Grants Policy Statement, § 2.3.6 https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.3.6_legal_implic ations_of_applications.htm [as of May 8, 2026 ]; see *id.,* § 2.1.2 https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.1.2_recipient_st aff.htm [as of May 8, 2026].)

2

UCSF has more than 20 locations throughout San Francisco and beyond. Research is conducted at several main locations, including its Mission Bay and Parnassus campuses, and ZSFG. Space is controlled by the Chancellor, who has delegated the authority to govern and reallocate existing space to the UCSF Space Committee. The committee includes the deans of the four professional schools and representatives of the Academic Senate, and is co-led by the Executive Vice Chancellor and Provost, and the Senior Vice Chancellor, Finance and Administration.

At the start of his faculty appointment, Dr. Chorba's research was conducted in the laboratory of his mentor, Dr. Kevan Shokat, located at UCSF's Mission Bay Campus. In 2021, when Chorba received several NIH "RO1" grants, he required additional space. But none was available at ZSFG. Dr. Powe, the Chief of Medicine at ZSFG, contacted the Cardiovascular Research Institute (CVRI) to provide temporary research space for Chorba until a new research building (Pride Hall) opened at ZSFG.

The RO1 grant applications, which had been executed by UCSF staff in 2020, described the research environment at UCSF generally and stated Dr. Chorba's "research will be performed in the laboratory of Prof. Kevan Shokat on the UCSF Mission Bay Campus until his transition to independence is complete."

An October 2020 letter of support from UCSF for one of Dr. Chorba's RO1 grants stated: "Regarding laboratory space, by the time of activation of this award, John will be provided the appropriate independent laboratory space for his staff in the vicinity of his mentor, Dr. Shokat, to facilitate his transition to independence. In 2023, we will open a state-of-the-art Research Building at [ZSFG], where we will consolidate laboratory research on the campus." The letter went on to state that Chorba's research program had

been included in the planning for the new research building and Shokat would continue to provide Chorba access to his laboratory and resources.

***The First MOU***

In June 2021, the Director of CVRI prepared a memorandum of understanding which he signed, as did Dr. Chorba and representatives of ZSFG and UCSF.  Chorba claims he signed the document because he had no other choice, and not because he agreed with its terms.

The MOU stated in pertinent part: "This is to memorialize our agreement regarding a short-term loan of space from CVRI to ZSFG for the purpose of providing laboratory space and office space to support the research program of Dr. John Chorba until the new UCSF Research and Academic Building at ZSFG opens, estimated in early 2023."  According to the MOU, no renovations to the CVRI space would be undertaken, and "all loaned space will be returned to CVRI in good condition upon being vacated."  Further, while Chorba occupied the loaned space, ZSFG and CVRI agreed to "split indirect cost return for Dr. Chorba's grants which is an exceptional request and which is approved only for the short period of time of this agreement."  Chorba acknowledges the lab space provided pursuant to this MOU was suitable for his needs.

As the date for the opening of Pride Hall neared, Dr. Chorba expressed a preference to stay at CVRI, and it was suggested he apply through an open search application for membership in the Institute.  He did so but was not selected.  An e-mail indicates a preference for candidates outside UCSF may have factored into this decision.  Chorba also expressed dissatisfaction with the Pride Hall space, asserting he could not pursue his research there.

4

Nevertheless, CVRI confirmed in early 2023 it would enforce the terms of the MOU and require Dr. Chorba to vacate the Institute once Pride Hall was completed.

Dr. Chorba was unhappy with this decision and filed a faculty misconduct claim in April 2023 asserting, among other things, improper governmental activity by UCSF personnel in refusing to provide him with adequate laboratory space.

***The First Grievance***

The following month, Dr. Chorba filed a formal grievance with the Academic Senate's Committee on Privilege and Tenure (P&T Committee), alleging multiple violations of his rights and privileges as a faculty member stemming from alleged failures to follow rules and requirements set forth in UCSF's Academic Personnel Manual (APM) and other policies. Although he recited a plethora of alleged violations, the gist of his grievance was threefold: (1) he was not properly reviewed or promoted because he was denied the institutional support (laboratory space, startup funds, and related equipment) necessary to pursue his grant research; (2) he was not considered for an open search position at CVRI because he was already employed by the hospital; and (3) he was not properly accommodated when he could not use his left hand or do lab work for three or four months due to being hit by a car in December 2018. According to Chorba, his mistreatment included being lied to, marginalized, and threatened.

In July, Dr. Chorba received a letter informing him he was scheduled to move to Pride Hall the following month. The letter stated in part: "Through consultation with research and space experts and review of your grants, we have determined that you can continue to work on your grants with the resources available in PRIDE hall, supported by your mentors and

5

collaborators for specialized equipment outlined in your institutional letters of support." Chorba promptly filed a whistleblower retaliation complaint.

The following month, the P&T Committee notified Dr. Chorba his grievance alleged a prima facie case for further review. We need not, and do not, recite here the details of the Committee's subsequent review. It suffices to say at this point the Committee ultimately concluded Chorba failed to establish the vast majority of the grievable violations of UCSF rules and policies he asserted.

### The Second MOU

In August 2023, the parties entered into a second MOU. This agreement provided Dr. Chorba laboratory space and equipment in the MLK Research Building at UCSF Benioff Children's Hospital Oakland (BCH Oakland) from September 1, 2023, through December 31, 2024, with the possibility for renewal. It recited that Chorba rejected the space offered him in Pride Hall in favor of the BCH Oakland space. It further stated the location, though in Oakland, was considered " 'on campus,' " such that ZHSF and UCSF staff would continue to administer Chorba's grants. The Division of Cardiology, ZSFG also agreed to cover the costs associated with the physical transfer of Chorba's laboratory supplies and equipment from CVRI to the MLK Research Building. Chorba claims he was not allowed any input into the language of this MOU and was told it was "standard" and "not up for negotiation." He also claims he was told his move to BCH Oakland—which took place in September—did "not obviate the possibility of consideration of [his] lab for future space" in Mission Bay if any became available.

### The Second Grievance

In June 2024, Dr. Chorba filed a second grievance, this time asserting a violation of APM-015-II-E. This provision states, "Faculty members have the

same rights and obligations of all citizens." Chorba claimed this assurance had been violated because various representatives of ZSFG and UCSF allegedly violated Labor Code section 970. That statute provides: "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either: [¶] (a) The kind, character, or existence of such work; (b) The length of time such work will last, or the compensation therefor; (c) The sanitary or housing conditions relating to or surrounding the work; (d) The existence or nonexistence of any strike, lockout, or other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought." (Lab. Code, § 970, subds. (a)–(d).)

The P&T Committee concluded this grievance failed to allege a prima facie case and denied it without further investigation. The Committee explained, "The grievance complaint alleges a violation under APM-015-II-E. However, APM 015-II addresses Professional Responsibilities, Ethical Principles, and Unacceptable Faculty Conduct, which refers to conduct that the University expects from faculty. As such, violations may constitute grounds for faculty discipline, but do not otherwise provide a basis for alleging a faculty grievance against the University." (Italics omitted.)

Since the grievance alleged improper governmental activities violating the Labor Code, the Committee was required to forward his allegations to the locally designated officer under applicable whistleblower policies.

7

### *Proceedings in Trial Court*

Dr. Chorba challenged the denials of his two grievances by way of a writ petition under both sections 1085 (traditional mandamus) and 1094.5 (administrative mandamus), seeking "to set aside" the P&T Committee decisions and to "compel the [Regents] to provide the necessary research facilities, equipment, and resources for his federally funded research" the Regents assertedly promised him.

In his first cause of action for administrative mandamus, Dr. Chorba challenged the P&T Committee's rejection of seven of the Administrative Policy Manual violations alleged in his first grievance (APM 015: I.1, APM 015: I.4, APM 036-b, APM-158-0-e, APM 210-1-a, APM 210 Appendix A, and APM 220-10). He additionally claimed the Committee did not hold a fair hearing and prejudicially abused its discretion.

His second cause of action, also for administrative mandamus, challenged the P&T Committee's conclusion that the allegations of his second grievance did not state a prima facie case.

Dr. Chorba's third cause of action, for ordinary mandamus, alleged the Regents had a ministerial duty to provide him with " 'the facilities and equipment described for and required to execute the projects with current NIH funding.' " In connection with this cause of action, Chorba alleged numerous violations of the federal False Claims Act by various ZSFG and UCSF employees.

### *Procedural History*

Dr. Chorba's writ petition was voluminous and included numerous attachments. Accordingly, the Regents sought additional time to respond, also noting the administrative record had not yet been compiled. Over

Chorba's objections, the trial court granted the Regents an additional 15 days to respond.

In short order, Dr. Chorba filed a motion to set a hearing date on the merits of his petition, asserting he was continuing to suffer damages due to the transgressions alleged in his petition. He also stated the length of his petition was due to unsuccessful efforts to procure the administrative record, and he believed the exhibits he had attached to his petition were the pertinent documents in the record.

The Regents opposed the motion to set, and shortly thereafter filed an answer to the writ petition.

In November, the Regents filed their memorandum in opposition to the writ petition. The Regents asserted the P&T Committee decisions were entitled to deference, substantial evidence supported the Committee's denials of Dr. Chorba's grievances, and Chorba had received a fair hearing. The Regents also filed a preliminary designation of the documents in the administrative record.

Dr. Chorba filed a reply to the Regent's answer.

A week later, he filed a reply to the Regents' opposition memorandum, claiming, among other things, that the evidence presented to the P&T Committee by one of the witnesses, Dr. Powe, was knowingly false and perjurious. As support for that accusation, Dr. Chorba attached two exhibits to his reply memorandum—the P&T Committee's notes of Powe's testimony and Powe's timeline detailing the efforts that had been made to find laboratory space for Chorba, both annotated with Chorba's own comments as to the supposed falsity of Powe's statements. In short, Chorba claimed the administrative decisions were not supported by substantial evidence because

9

some evidence was untrue or did not tell the whole story, some supported his position, and some was never provided to the Committee.

The Regents filed objections to the exhibits submitted with Dr. Chorba's reply. They maintained the statements, including Chorba's annotations, were hearsay and, in any case, they were not part of the administrative record and thus not properly before the court.

Dr. Chorba responded that the Regents' objections were an attempt to obfuscate the truth. He claimed he had been unable to obtain the administrative record before filing his writ petition and, thus, had been unable to discuss the record in his prior filings. Chorba also claimed he had not violated section 1094.5, subdivision (e), which significantly limits the presentation of new evidence in administrative mandamus proceedings, in submitting the new material because it "illustrate[d] why the AR is self-contradictory and why the testimony in the AR is false."

At a December hearing, the trial court confirmed the administrative record had been finalized and received assurances from Dr. Chorba that he had "filed all the briefs [he] wanted to file." Accordingly, the court proceeded to set a hearing on the merits on January 2, 2025. On that day, the court continued the hearing to the end of the month.

In the meantime, Dr. Chorba filed a declaration of damages setting forth his alleged ongoing damages—almost $20 million in terminated grants, lost grants, and grant money spent wastefully or fraudulently.

The Regents objected to the declaration since it had never been seen by the P&T Committee and was not in the record. Further, if the belated declaration were allowed, the trial court would be required to send the matter back to the Committee to review its decision.

10

Dr. Chorba filed a reply, arguing, among other things, that remand would not be required because section 1094.5, subdivision (e), provides that " 'in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court **may admit the evidence at the hearing on the writ without remanding the case**.' "  He then argued the trial court was required to use its independent judgment because "the Constitutional authority of the Regents is limited to University affairs," and his grievance extended to larger issues.

Dr. Chorba next filed an exemplary damages attachment to his writ petition, relying on Civil Code section 3294, subdivision (a) which states: " '[I]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.' "  The proffered attachment listed multiple alleged facts Chorba claimed showed malice and fraud.

The Regents again objected, including because the P&T Committee had never seen the attachment and it was not part of the administrative record, and because allowing the belated submission would violate the Regents' due process rights.

In reply, Dr. Chorba asserted he had not knowingly violated any procedural requirements, saying instead that "[a]s a self-represented party," he may have been "unaware of specific rules or norms of the Court that he may have inadvertently violated."

*Hearing on the Writ Petition*

After issuing a tentative decision in favor of the Regents, the trial court proceeded with the hearing on the merits of the petition.  Throughout the

11

hearing, the court reminded Dr. Chorba it would only consider issues raised in the briefing and the record before it. So when Chorba suggested certain acts occurring after the P&T Committee's decision on his first grievance bore on the fairness of the proceeding, the court stated: "I just want to make clear perhaps they can be considered. They're not before me right now. I'm going to decide this on the administrative record. The 1094.5 administrative record, the 1085 on the record that's before me." It then reiterated and clarified, "I'm only going to consider arguments that have been made through the papers." And again, when the court observed that the substantial evidence standard was highly deferential and Chorba asked if he was allowed to argue "substantial evidence is the wrong standard," the court stated, "You didn't brief that. It's not before me." The applicable standard—substantial evidence—was "uncontested in the pleadings."

With respect to Dr. Chorba's traditional mandamus claim, the court asked him to provide "a citation to the record that tells me exactly what the university has a mandatory ministerial duty to provide to you." Chorba responded by referring to the facilities and equipment descriptions contained in his three NIH grants certified by UCSF in 2020. He also cited to the job advertisement under which he was hired, which stated the successful applicant would be provided "outstanding research space and a generous startup package."

Counsel for the Regents argued Dr. Chorba had not demonstrated any entitlement to traditional mandamus relief. And as for his administrative mandamus claims, counsel reiterated the Regents' position that substantial evidence supported the P&T Committee's denial of his two grievances.

12

*Denial of the Writ Petition*

The trial court denied Dr. Chorba's writ petition by written order filed in early February. After stating it had reviewed the administrative record, the court first rejected Chorba's claims of procedural unfairness. The court went on to conclude, that with respect to Chorba's first grievance, the P&T Committee's findings were supported by substantial evidence, citing various portions of the record. As to the second grievance, the court concluded the P&T Committee's determination that the grievance failed to state a prima facie case was sound.

Turning to Dr. Chorba's traditional mandamus claim, the court concluded he had failed to show the Regents had a clear, present, and ministerial duty to act. Specifically, it found Chorba had failed to establish the "precise parameters" of any duty owed him by UCSF with respect to laboratory facilities and equipment. The court concluded, in short, that it was "not in a position to manage or supervise UCSF's space and equipment decisions, and certainly [was] in no such position given the opacity of the alleged rights and duties and the discretion UCSF enjoys in allocating its resources."

The court additionally sustained the Regents' objections to Dr. Chorba's additional evidence on hearsay grounds and sustained its relevance objections to Chorba's exemplary damages statement. It also denied Chorba's request for a continuance of the hearing to provide further evidence assertedly supporting his administrative mandamus claim.

## DISCUSSION

*Administrative Mandamus*

Section 1094.5, California's administrative mandate statute, governs judicial review of adjudicatory decisions by administrative agencies. (*Akella*

13

*v. Regents of University of California* (2021) 61 Cal.App.5th 801, 813 (*Akella*); see § 1094.5, subd. (a).) "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)

Administrative mandamus makes inquiry into "the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer. . . ." (§ 1094.5, subd. (a).) As to the first two prerequisites, "it is the *requirement* of a hearing and taking of evidence—not whether a hearing is actually held and evidence actually taken—that triggers the availability of [administrative] mandamus review." (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1729 (*Pomona College*).) A faculty grievance procedure has been held to be a "hearing" within the meaning of section 1094.5. (*Ishimatsu v. Regents of University of California* (1968) 266 Cal.App.2d 854, 860–862 (*Ishimatsu*).) Thus, although a "grievance hearing [is] ' "in no sense a trial[,"] a hearing suffices for administrative mandamus.' " (*Pomona College*, at p. 1730; *id.* at p. 1720 [administrative mandamus is exclusive remedy for college professor to challenge decision denying him tenure].)

" '[A] hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency.' " (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93,

14

101 (*Pomona Valley*).) "Augmentation of the administrative record is permitted only within the strict limits set forth in section 1094.5, subdivision (e) which provides as follows: 'Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case.' [Citations.] In the absence of a proper preliminary foundation showing that one of the exceptions noted in section 1094.5, subdivision (e) applies, it is error for the court to permit the record to be augmented. [Citation.] Determination of the question of whether one of the exceptions applies is within the discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is manifestly abused." (*Ibid.*)

### *Standard of Judicial Review*

Generally, in an administrative mandamus proceeding where it is claimed the administrative decision is not supported by the evidence, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (§ 1094.5, subd. (c).) However, where an "administrative decision substantially affects a fundamental vested right, the [trial] court must independently review the record to determine whether the weight of evidence supports a factual finding." (*O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1116 (*O'Brien*).)

Thus, "our focus" on appeal "varies with the standard of review employed by the trial court. [Citation.] ' "If a fundamental vested right was

involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.] On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence." ' " (*O'Brien, supra,* 92 Cal.App.5th at p. 1116.)

"Whether an administrative decision substantially affects a vested fundamental right is determined on a case-by-case basis. [Citation.] 'When determining what rights are fundamental for administrative review purposes, the court must determine if the right fundamentally affects the life situation of the individual to require independent review or whether it merely impacts an area of economic privilege in a less than fundamental manner.' " (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 218.)

For the first time on appeal, Dr. Chorba claims the trial court should have exercised its independent judgment because his grievances assertedly pertained to his fundamental right to "pursue his profession." The Regents maintain Chorba forfeited the issue by failing to raise it in the trial court. We agree.

" ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried." ' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 (*Hewlett-Packard*).) " ' "This rule is based on fairness—it would be unfair, both to the trial court and opposing litigants, to permit a change of theory on appeal." ' " (*Ibid.*; see *JRS*

16

*Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 ["Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider."]; see e.g., *Akella, supra,* 61 Cal.App.5th at p. 814, fn. 6 [finding argument with respect to applicability of independent judgment forfeited when raised via petition for rehearing].)

Here, by the time the trial court heard Dr. Chorba's motion to set his writ petition for hearing on the merits, Chorba had filed his writ petition, the Regents had filed both an answer to the petition and their opposition memorandum to writ relief, and Chorba had filed replies to both the Regents' answer and their opposition memorandum. In not one of his filings, did Chorba assert the trial court was required to exercise independent review, let alone because his grievances substantially affected his fundamental right to pursue his profession. Moreover, at the scheduling hearing, Chorba assured the court he had "filed all the briefs [he] wanted to file."

Nevertheless, Dr. Chorba proceeded to file two more documents—a declaration of damages and an exemplary damages attachment to his petition. The Regents objected to both. Not until his reply to the Regents' objection to his declaration of damages did Chorba make any mention of the independent judgment standard, and then it was only in connection with the Regents' assertion that the trial court's only procedural option, if it considered the belatedly proffered document, was to order the P&T Committee to review its decision. Chorba cited to section 1094.5, subdivision (e), which states: "[I]n cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." He then asserted, "[T]he appropriate standard of review is not 'substantial evidence'

17

but rather 'independent judgment,' because the Constitutional authority of the Regents is limited to University affairs (Cal. Const. art IX. § 9). The issues in this proceeding include improper governmental activity and the fraudulent misuse of public funds and taxpayer money. This is not simply a University affair. The Regents do not have Constitutional authority to adjudicate misuse of public funds, especially as the Regents are explicitly placed under legislative control as to the 'security of its funds' (Cal. Const. art IX. § 9). Rather, the Constitutional authority for adjudicating such decisions is in the hands of the Courts (Cal. Const. art VI. § 1)." In his reply to the Regents' objections to his exemplary damages attachment to his writ petition, Chorba cross-referenced this argument without further discussion.

In short, prior to his replies to the Regents' objections to his belatedly filed declaration of damages and exemplary damages attachment to his petition, Dr. Chorba never questioned the applicability of the substantial evidence standard, even though the Regents explained at some length in their opposing memorandum why the substantial evidence standard applied. In his reply to that memorandum, Chorba not only did not question the Regents' assertion that the substantial evidence standard applied, but he went on to argue the P&T Committee's denials of his grievances were not supported by substantial evidence. When Chorba finally questioned the applicability of the substantial evidence standard in his reply to the Regents' objection to his belated declaration of damages, he claimed the independent judgment standard applied "because the Constitutional authority of the Regents is limited to University affairs (Cal. Const. art IX. § 9)," *not* because

18

the P&T Committee's decisions substantially affected his fundamental right to "pursue his profession."

Simply put, this case was never litigated in the trial court as substantially implicating a fundamental right. Rather, the Regents' opposition to Dr. Chorba's writ petition clearly identified substantial evidence as the applicable standard, and both parties focused their briefing on whether the P&T Committee's decisions were supported by such evidence. Although Chorba made passing reference to the independent judgment standard in his reply to the Regents' opposition to his belated declaration of damages, he never identified any fundamental right he believed triggered that heightened standard of review, let alone the asserted right to pursue his profession he is now claiming on appeal.

We therefore deem Dr. Chorba to have forfeited the issue. Indeed, were we to allow this new argument on appeal, we would be treating the Regents unfairly and granting Chorba exceptional treatment due to his status as a self-represented litigant. This we decline to do. (See *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984–985.)

Even if we were to reach the issue, we would reject Dr. Chorba's claim that the independent judgment standard, rather than the substantial evidence standard, of judicial review applies for the reasons discussed at length in *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474 (*Do*).

As the court explained in *Do,* because the University of California is an agency " 'of constitutional origin' " empowered to adjudicate internal employment disputes, judicial review of such decisions, including decisions affecting assertedly fundamental vested rights, is limited to determining whether they are supported by substantial evidence. (*Do*, *supra*,

19

216 Cal.App.4th at pp. 1483–1489.) The plaintiff in *Do* "fail[ed] to recognize that not every circumstance of public employment creates vested property rights to continue it. Instead, statutory or due process entitlement to independent judgment review in a particular case depends upon the type of public agency involved and whether the agency was created by the Constitution in such a manner as to delegate quasi-judicial decisionmaking powers. This was made clear in *Strumsky* [*v. San Diego County Employees Retirement Assn* (1974)] 11 Cal.3d 28, 34–35: A right to 'a full and independent judicial review' of an agency's decision to terminate an individual's public employment *does not exist* in the case of agencies 'of constitutional origin which have been granted limited judicial power by the Constitution itself.' (*Ibid.*, italics omitted, citing *Ishimatsu, supra,* 266 Cal.App.2d 854, among others.) Thus: 'It is established that when a review of a decision of an agency falling within [such] categories is sought pursuant to section 1094.5 of the Code of Civil Procedure, the court's scrutiny of the agency's factual findings is limited to a determination whether those findings are supported by substantial evidence in light of the whole record— *and this is so whether or not the decision of the agency affects a fundamental vested right.*' (*Strumsky,* [at p. 35], some italics added.)" (*Id.* at p. 1485.)

The *Do* court went on to explain that "*Ishimatsu, supra,* 266 Cal.App.2d 854, 864, and *Amluxen v. Regents of University of California* (1975) 53 Cal.App.3d 27, 32 . . . are generally accepted authorities stating that the California Constitution has granted the University quasi-judicial powers regarding matters falling within its broad powers to organize and govern the university, and this includes quasi-judicial adjudication of employment rights. (Cal. Const., art. IX, § 9, subd. (a); *Apte v. Regents of University of California* (1988) 198 Cal.App.3d 1084, 1091. . . .) Such University

20

administrative decisions are subject to review under the substantial evidence rule." (*Do, supra,* 216 Cal.App.4th at p. 1485.)

While the *Do* court acknowledged the "few exceptions" to this rule of " ' "general immunity from legislative regulation" ' "— "the Legislature's powers of (a) appropriation for salaries; (b) enaction of general police power regulations to be applied to the University; and (c) legislation that regulates ' "matters of statewide concern not involving internal university affairs" ' "— it concluded they were not implicated in Do's case. (*Do, supra,* 216 Cal.App.4th at p. 1487.) Rather, "the delegated powers that are necessary or convenient for the effective administration of the University's business include quasi-judicial administrative authority to resolve individualized employment disputes, by applying University policies to particular cases." (*Ibid.*)

So too, here. We therefore turn to Dr. Chorba's substantial evidence challenge.[2]

### Substantial Evidence Supports The P&T Committee Decisions

In applying the substantial evidence standard, " 'we focus on the decision of the agency rather than that of the trial court and " 'answer the

---

[2] While Dr. Chorba's principle argument about the standard of judicial review is that the trial court should have applied the independent judgment standard, he also claims that because the trial court did not, in its order, discuss all of the evidence in the administrative record, it therefore failed to consider whether substantial evidence supports the P&T Committee's decisions " '*in light of the whole record.*' " To begin with, the trial court recited the correct standard in its written order, and we must "presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.) Furthermore, as we have explained, we are reviewing the *Committee's* decisions on his grievances, not the trial court's rulings with respect to those decisions.

same key question as the trial court . . . whether the agency's findings were based on substantial evidence.' " ' [Citation.] This requires the reviewing court to consider all relevant evidence in the administrative record and view that evidence in the light most favorable to the agency's findings, drawing all inferences in support of those findings. [Citation.] The reviewing court does not substitute its own findings and inferences for that of the agency. [Citation.] 'Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence.' " (*Akella*, *supra*, 61 Cal.App.5th at p. 814.) "[O]ur review is not designed to rectify an imprudent decision by an administrative agency. Administrative mandamus is not to be used to control the discretion of an administrative body, but only to ensure that it was not abused." (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 419 (*Young*).) "It is for the agency to weigh the preponderance of conflicting evidence." (*Ibid.*)

Put another way, " '[t]he petitioner in an administrative mandamus proceeding has the burden of proving that the agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty. When the standard of review is the substantial evidence test . . . it is presumed that the findings and actions of the administrative agency were supported by substantial evidence. [Citations.] Thus, since the same standard of review applies now on appeal as [it] did in the trial court, the burden is on appellant to show there is no substantial evidence whatsoever to support the findings of the [agency].' " (*Young, supra,* 10 Cal.App.5th at p. 419.)

We must also bear in mind that an administrative body's interpretation of its own rules and policies is generally entitled to reasonable deference.

(See *Akella, supra*, 61 Cal.App.5th at p. 817 ["considering it is well within the Regents' constitutionally delegated authority (Cal. Const., art. IX, § 9) to hear and resolve disputes related to the administration of the university's academic affairs 'by applying University policies to particular cases' [citation], we conclude that Privilege & Tenure's interpretation is entitled to a reasonable degree of judicial deference"]; accord, *Balakrishnan v. Regents of University of California* (2024) 99 Cal.App.5th 513, 525 (*Balakrishnan*) [" 'a reviewing court accords an administrative agency's interpretation of its own regulation great weight and deference, unless the interpretation is unauthorized or clearly erroneous' "].)

Dr. Chorba acknowledges these two cases, but for the general proposition "the degree of deference owed the University in interpreting one of its policies depends on the interpreter's familiarity with the policy at issue, whether the University has adhered consistently to the interpretation at issue, and whether there was an opportunity for comment to be made on the interpretation." (*Balakrishnan, supra*, 99 Cal.App.5th at p. 526, fn. 11, citing *Akella, supra*, 61 Cal.App.5th at pp. 816–817.) He claims no deference should be given here because the P&T Committee's decisions fail on all three counts.

Dr. Chorba concedes that the P&T Committee meets the test of familiarity with respect to its own policies and procedures. (See *Balakrishnan, supra*, 99 Cal.App.5th at p. 528 [Noting the challenged interpretation of the Faculty Code of Conduct "was made by a committee comprised of three of plaintiff's fellow UCSC professors, adding to its evidentiary weight. As recognized by numerous courts 'contextual familiarity matters. The disputed policy language, while not complex or technical, should be interpreted in a manner that is both knowledgeable of and sensitive to the needs of [the] department and university population to which

23

it applies.' "].)  He argues, however, that the Committee cannot claim familiarity with the federal policies supposedly at play.  While that may be true, the Committee did hear from a former Chair of the UCSF Space Committee regarding the interplay between NIH grants and space allocations.  More importantly, though, as much as Chorba would like to make this case about whether UCSF violated the terms of his NIH grants by allocating him assertedly inadequate laboratory space and equipment, what this case is actually about is whether he stated valid grievances under UCSF's own policies, which does not require familiarity with NIH regulations.

Dr. Chorba next asserts the P&T Committee fails the test of consistency because, in considering his grievance allegations, it vacillated between textualism and purposivism—sometimes adhering strictly to the wording of a policy and other times ignoring the text in favor of an underlying purpose.  But the consistency required is with respect to the interpretation of the *same* policy, not the interpretative approach that may be brought to bear amongst policies.  (See *Akella, supra,* 61 Cal.App.5th at p. 817.)  Chorba fails to point to any instance where the P&T Committee had engaged in different interpretations of the policies and procedures at issue here.

Finally, Dr. Chorba claims the P&T Committee fails the test for comment and feedback because their Committee proceedings are confidential, so their interpretations receive no public comment.  But again this misses the point, which is that an administrative rule, the *adoption* of which is subject to formal review and comment, may receive more deference than one which was informally adopted.  (See *Akella, supra,* 61 Cal.App.5th at p. 817.)

24

In sum, there is no basis in this record to depart from the general rule extending considerable deference to an administrative body's interpretation of its own rules and policies.

### *First Grievance*

Dr. Chorba challenges the P&T Committee's rejection of seven of the alleged Administrative Policy Manual violations set forth in his first grievance (APM 015: I.1, APM 015: I.4, APM 036-b, APM-158-0-e, APM 210-1-a, APM 210 Appendix A, and APM 220-10).[3] While he makes various overarching legal arguments on appeal—for example, regarding the appropriate standard of review and the amount of deference generally afforded to the P&T Committee's interpretations of UCSF rules and policies—he makes few specific arguments as to the Committee's conclusions that none of these policies supported his claims.

*Relocation to Pride Hall*

Two of the violations Dr. Chorba alleged in his first grievance were based on Part I of the Faculty Code of Conduct (APM 015: I.1). Part I "sets forth the responsibility of the University to maintain conditions and rights supportive of the faculty's pursuit of the University's central functions." It states: "In support of the University's central functions as an institution of higher learning, *a major responsibility of the administration is to protect and encourage the faculty in its teaching, learning, research, and public service.* The authority to discipline faculty members in appropriate cases derives from the shared recognition by the faculty and the administration that the purpose

---

[3] To the extent Dr. Chorba's briefing raises policy violations not alleged in his writ petition, they have been forfeited. (See *M.N. v. Morgan Hill Unified School Dist.* (2018) 20 Cal.App.5th 607, 632 (*M.N.*) [doctrine of forfeiture applies in writ proceedings]; *Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 306 [same].)

of discipline is to preserve conditions hospitable to these pursuits." (Italics added.) Such conditions, as they relate to the faculty, include, for example, "free inquiry, and exchange of ideas" and "freedom to address any matter of institutional policy or action when acting as a member of the faculty."

Dr. Chorba claimed requiring the move of his laboratory to Pride Hall violated his right to the "free exchange of ideas" because it would "prevent[] [his] laboratory from efficiently interacting with others in [his] field (chemical biology) and isolate[] [him] from [his] professional colleagues." The P&T Committee rejected this assertion, stating "Close physical proximity is not inherently required to support free inquiry and exchange of ideas." This is unquestionably a reasonable, commonsense interpretation of APM 015: I.1, and one certainly entitled to deference.

While Dr. Chorba clearly would have preferred staying at CVRI, the evidence was undisputed that this was not an option, and another location needed to be identified. UCSF was going through a major transition during this timeframe, and space at the university was at a premium, especially specialized space. While Chorba was not the only faculty member concerned about perceived deficiencies in the new Pride Hall space, the Space Committee nevertheless determined it was adequate for Chorba's needs, and it could not identify alternative space. The record also indicates locating in the Mission Bay area would allow Chorba "access to appropriate facilities/expert collaborators," as well as facilitate "travel to ZSFG for clinical responsibilities." Indeed, Pride Hall, itself, is only a short car trip from the Mission Bay Campus.[4] Thus, while the Pride Hall space was perhaps not

---

[4] On our own motion, we take judicial notice of the readily ascertainable fact that Pride Hall is located approximately 10 minutes by car from the Mission Bay Campus. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

26

optimal, substantial evidence supported the P&T Committee's conclusion that a move to that new space would not infringe Chorba's right to the free exchange of ideas in violation of APM 015: I.1.

Once Dr. Chorba rejected the Pride Hall space in favor of relocating across the bay to BCH Oakland, a "free exchange of ideas" was perhaps more difficult. But as one of the P&T Committee members pointed out, Chorba chose the BCH Oakland space over Pride Hall. And "the question [before the Committee] isn't about whether it's too difficult to recruit people to Oakland, it's whether the space offered at [P]ride [H]all was a violation of those rights." (Underscoring omitted.) In short, Chorba's grievance concerned the adequacy of the Pride Hall space offered to him, not supposed issues associated with the BCH Oakland space.[5]

Dr. Chorba additionally claimed the relocation of his lab space to Pride Hall violated APM 015: I.4, a provision of the Faculty Code of Conduct guaranteeing him "freedom to address any matter of institutional policy or action when acting as a member of the faculty." Chorba maintained restricting his access to the UCSF Space Committee prevented his "ability to address the institutional policy of space assignment." He further asserted his

---

[5] Dr. Chorba complains the P&T Committee failed to consider another claim about the Oakland space—that his signature on the second MOU (pursuant to which he relocated from the CVRI to BCH Oakland) was coerced and he was not allowed to provide input into the wording of the document. Again, the grievance before the Committee did not involve Chorba's decision to move to Oakland, but whether "the space offered at [P]ride [H]all was a violation of those rights." (Underscoring omitted.) Thus, there was no need for the Committee to respond to allegations of irregularities with respect to the second MOU. That document is of interest only as procedural context— i.e., that Chorba's lab was temporarily located at the CVRI, where he was pleased, and that he later made the decision to move to BCH Oakland instead of Pride Hall because he thought it the lesser of two evils.

concerns about the lab space assignment were "not communicated in the short form submitted" to the Space Committee by his department. The P&T Committee rejected this claim on the ground APM 015: I.4 "does not provide unimpeded access to specific University Faculty and Staff (i.e., UCSF Space Committee) in settling of disagreement with policy decisions." Again, this is a reasonable interpretation of the policy and is certainly not unauthorized or clearly erroneous. Indeed, the record makes clear Chorba *has* exercised his freedom to share his concerns regarding UCSF's institutional policy of space assignment with numerous members of the UCSF community, as well as with the general public.

*Denial of Application for position in CVRI*

Dr. Chorba also challenged the rejection of his application for an open search position within CVRI under five UCSF policies. The first, APM-158-0-e, provides academic appointees the right "to contribute meaningfully to the review process in academic personnel actions affecting them." Chorba claimed this right was violated during the CVRI application process because, as an internal candidate, his application apparently was not considered and thus he was "not allowed to meaningfully contribute to the review process." The P&T Committee concluded the CVRI application was not " 'an academic personnel action' " for purposes of this policy. Rather, "the CVRI selection process is a matter of internal HR policy." The record also makes clear membership in the CVRI is highly competitive and is generally a lifetime appointment, distinct from the promotion and tenure track for professors. Thus, again, the Committee's conclusion that applying for membership in

28

CVRI was something separate and apart from " 'an academic personnel action' " was a reasonable interpretation and application of the policy.[6]

Dr. Chorba further argued the denial of his CVRI application violated policies providing "Instructions to Review Committees That Advise on Actions Concerning Appointees in the Professor and Corresponding Series." (Boldface omitted.) APM 210-1-a states it is the duty of such committees "to ascertain the present fitness of each candidate and the likelihood of the candidate's pursuing a productive career." Similarly, APM 220 applies to appointments and promotions in the Professor Series. Pursuant to APM 220-10: "A candidate for appointment, merit increase, or promotion in this series shall be judged by the following criteria: [¶] a. Teaching [¶] b. Research and creative work [¶] c. Professional competence and activity [¶] d. University and public service."

Dr. Chorba asserted both provisions were violated because his affiliation with the ZSFG Division of Cardiology (i.e., his inside applicant status) was not one of the defined criteria for consideration with respect to the CVRI position. As we have stated, the P&T Committee reasonably took the position "[t]he CVRI search did not constitute an appointment, merit increase, or promotion," and membership in CVRI is distinct from the

_____

[6] There likewise is no merit to Dr. Chorba's argument that a position at CVRI is an "appointment." Chorba cites to application materials for the CVRI position, which are not in the administrative record. Thus, the issue is beyond the scope of our review. (See *Pomona Valley*, *supra*, 55 Cal.App.4th at p. 101; § 1094.5, subd. (e).) In any case, the materials not only do not support Chorba's interpretation, but they align with the P&T Committee's determination that CVRI membership is separate from the "[p]rimary academic appointments in an appropriate basic science or clinical department," which would be provided to a successful candidate. As an internal candidate, Chorba *already had* the primary academic appointment that a successful CVRI applicant would have received.

promotion and tenure track for professors.  That reasonable interpretation called, in turn, for the rejection of Chorba's claim, since both of the policies he invoked apply solely to appointments and promotions within the professor series.

Dr. Chorba's final two claims concerning the denial of his CVRI application were predicated on anti-discrimination and internal promotion policies.  APM 210 Review and Appraisal Committees, Appendix A: Statement on Professional Ethics, III states: "Professors do not discriminate against or harass colleagues."  Chorba contended he was discriminated against as an internal applicant during the CVRI application process.  With respect to selection for employment, APM-036-b provides: "In selecting from among candidates who are substantially equally well-qualified for a particular position, the appointing authority is reminded to pay attention to the general University commitment and policy of encouraging promotion of University employees."  Chorba claimed, "With regards to the open CVRI search, this policy was not followed, as my application was not considered."  But as we have discussed, the P&T Committee reasonably concluded the CVRI selection process is distinct from the promotion and tenure track for professors and is a matter of internal HR policy.  Appendix A to APM 210 involves appraisal of professors and APM-036-b relates to selection for employment.  Thus, the Committee's conclusion that neither policy pertained to the CVRI application process was eminently reasonable.

*Academic Support*

Dr. Chorba also argued UCSF's alleged failure to provide institutional support violated the same policies discussed above.  Citing to APM-158-0-e, he asserted he "was not allowed to communicate the lack of institutional support to the review committee.  This would be a meaningful contribution to

30

review, as it would put my achievements in the proper context." The P&T Committee rejected this claim stating, "Faculty are afforded opportunity to list concerns regarding support within packet for promotion." Citing to APM 210-1-a, Chorba claimed the promotions committee "could not properly ascertain my present fitness without understanding the lack of institutional support and my ability to create a research program entirely on my own." The P&T Committee rejected this claim, stating, "[P]romotion issue not related to policies." Citing to APM 210 Review and Appraisal Committees, Appendix A III, Chorba claimed: "With regards to promotion, the [promotions committee] effectively discriminated against me as a faculty member with no institutional support. This effectively put me in 'double jeopardy'—I was reviewed on metrics that are strongly influenced by the presence of institutional support; so not having the institutional support effectively doomed my promotional review." The P&T Committee also rejected this claim, observing: "A lack of institutional support does not necessarily demonstrate discrimination or harassment."

Not only were the Committee's responses reasonable, but at the beginning of its written denial of Dr. Chorba's grievance, the Committee cited to Bylaw 335.B.2. This provision mandates: "In cases of personnel review involving tenure, promotion, or reappointment, such grievances *may be based only on* allegations: (a) that the procedures were not in consonance with the applicable rules and requirements of the University or any of its Divisions, and/or (b) that the challenged decision was reached on the basis of impermissible criteria, including (but not limited to) race, sex, sexual orientation, gender identity, or political conviction. The committee shall be empowered to determine the validity of the grievances under (a) or (b) but

31

shall not be empowered to reevaluate the academic qualifications or professional competence of the grievant." (Italics added.)

All of the claims Dr. Chorba made in his grievance with respect to lack of institutional support involved issues of promotion. But the P&T Committee determined Chorba's "[a]llegation of lack of institutional support preventing appropriate assessment of professional conduct does not fall into permissible grievance categories for 'tenure, promotion, and reappointment.' " Again, this was a reasonable interpretation of policy.

Finally, citing APM 210 Review and Appraisal Committees Appendix A III regarding discrimination, Dr. Chorba claimed retaliation based on a letter sent to him by Dr. Powe and two other faculty members. Chorba maintained the letter constituted a "written threat for adverse employment actions" (underscoring omitted) against him and was "in part based on discrimination by personal or arbitrary reasons, and/or on the basis of my moral convictions (a proxy for religion)."

The letter addressed the move of Dr. Chorba's laboratory space to Pride Hall and stated: "Through consultation with research and space experts and review of your grants, we have determined that you can continue to work on your grants with the resources available in PRIDE hall, supported by your mentors and collaborators for specialized equipment outlined in your institutional letters of support. **This space assignment is final and requires your immediate attention to plan for your move**." The letter further stated: "Given your prior statements that you plan to physically resist or block the scheduled move of your lab, it is important that we make sure you are aware of the consequences of failing to follow the Department of Medicine directive to move your lab on schedule." These consequences included: UCSF would assume he had voluntarily stopped working on his

grants; it would deactivate his badge access to the CVRI space, as well as the badge access for all of his lab personnel, it would inform NIH that, in the absence of a working lab, it would no longer be able to charge salaries or nonpayroll expenses to the Chorba grants; it could refer him to discipline for " 'hold[ing] over' "; and it could find him not in good standing as a faculty member if he was unable to support his salary. "Physical attempts to prevent or block the move (including demanding to be physically evicted by UCPD)" could also lead to formal discipline.

The P&T Committee rejected Dr. Chorba's discrimination claim, stating: "Elucidation of adverse outcomes in setting of failure to follow policies and vacate temporary lab space at the completion of previously agreed upon timeline does not equal a written threat for adverse employment actions/retaliation."

Dr. Chorba asserts the P&T Committee used an incorrect definition of adverse employment action, citing to APM 150-30(a)(1). That policy provides that a " 'written warning' is a 'communication that informs the appointee of the nature of the misconduct or deficiency, the method of correction, and the probable consequence of continued misconduct or deficiency." This policy *further* states that "[a]n informal spoken warning *or a letter outlining performance expectations* is not an official corrective action." (Italics added.) Thus, the policy, in its entirety, actually supports the Committee's conclusion that the letter at issue was not a written threat of an adverse employment action/retaliation. In short, the Committee's rejection of Chorba's reading of the policy was, again, eminently reasonable.[7]

---

[7] Having upheld the rationale for the P&T Committee decisions Dr. Chorba challenges on appeal, we need not consider further his complaint pursuant to *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515, that the Committee failed to set forth sufficient

### Second Grievance

The P&T Committee denied Dr. Chorba's second grievance on the ground it failed to state a prima facie case because the policy on which he relied, APM-015-II, describes a basis for faculty *discipline*, not a basis for a faculty *grievance*.

Dr. Chorba maintains that since faculty members have the same rights as all citizens under APM-015-II-E, and that his grievance alleged violations of his rights under the Labor Code (rights afforded all citizens), he necessarily alleged a prima facie case and the Committee should have moved to the next step of the review process. He further argues nothing in the language of APM-015-II-E supports the Committee's reading of the policy. According to Chorba, by referencing both *rights* and obligations, the policy language suggests it is not solely restricted to disciplinary proceedings.

Even apart from the deference we should accord the P&T Committee's interpretation, the plain language of APM-015 is squarely at odds with Dr. Chorba's reading of the policy. APM-015 sets forth the Faculty Code of Conduct within UCSF's Academic Personnel Manual. Its purpose is "to protect academic freedom, to help preserve the highest standards of teaching and scholarship, and to advance the mission of the University as an institution of higher learning." "Part I of this Code sets forth the responsibility of the University to maintain conditions and rights supportive of the faculty's pursuit of the University's central functions." Part II, in contrast, "elaborates standards of professional conduct, derived from general professional consensus about the existence of certain precepts as basic to

---

findings " 'to bridge the analytic gap between the raw evidence and the ultimate decision or order.' " As we have discussed, the Committee provided adequate reasons for its rejection of Chorba's claims.

acceptable faculty behavior.  Conduct which departs from these precepts is viewed by faculty as unacceptable because it is inconsistent with the mission of the University.  The articulation of types of unacceptable faculty conduct is appropriate both to verify that a consensus about minimally acceptable standards in fact does exist and *to give fair notice to all that departures from these minimal standards may give rise to disciplinary proceedings*."  (Italics added.)

In other words, Part I of APM-015 sets forth UCSF's responsibilities to its faculty for which any violations can be grieved, while Part II sets forth faculty responsibilities for which any violations can lead to discipline.

The wording of the ethical principle relied upon by Dr. Chorba—that " '[f]aculty members have the same rights and obligations as all citizens' " (APM-015-II-E)—does not change this analysis.  Whether discipline is appropriate in any given context depends on *both* a faculty member's rights and responsibilities.  For example, it would be inappropriate to discipline a faculty member for expressing their first amendment rights.  Indeed, the provision goes on to state faculty members " 'are as free as other citizens to express their views and to participate in the political processes of the community.' "  In contrast, a faculty member might be disciplined for intentionally misrepresenting their "personal views as a statement of position of the University or any of its agencies"—i.e., violating a responsibility.

In short, the P&T Committee was on solid ground in determining Dr. Chorba's second grievance failed to state a prima facie claim.

### Challenge to the Administrative Process

Dr. Chorba also claimed the P&T Committee's procedures were unfair and therefore violated his due process rights.  He complains, specifically, that he did not receive a "full evidentiary hearing," he was not permitted to

35

address the asserted falsity of Dr. Powe's testimony, the Committee did not fully consider the evidence, and the Chancellor was biased against him.

### UCSF Grievance Procedures

The P&T Committee has jurisdiction to deal with grievances in accordance with Academic Senate Bylaw 335 (Bylaw 335). Pursuant to that provision, "Any member of the Academic Senate may grieve to the Divisional Privilege and Tenure Committee (hereafter, the Committee) that the member's rights or privileges have been violated." (Bylaw 335.A.1.) Before filing a formal grievance, a potential grievant is provided a confidential contact with whom to discuss the claim. (Bylaw 335.B.1.) In cases where the grievance alleges improper governmental activities, the contact must explain to the potential grievant their right to make a protected disclosure of such allegations to the locally designated officer under relevant whistleblower policies. (*Ibid.*)

Once a written grievance is filed, the P&T Committee "shall first determine whether or not the grieving Senate member has made out a prima facie case. This determination shall be limited to a review of the written grievance only. A prima facie case shall be deemed established if the Committee concludes that the allegations as stated in the written grievance, if true, would constitute a violation of the faculty member's rights and privileges." (Bylaw 335.B.2, italics omitted.) If the grievance contains allegations of improper governmental activities, the Committee must report those allegations to the locally designated officer under relevant whistleblower policies. (*Ibid.*)

If the Committee finds the grievance states a prima facie case, it may conduct a preliminary review of the evidence to determine whether there is sufficient reason to believe that a right or privilege of the grievant may have

36

been violated. "In the course of its preliminary review, the Committee shall provide the grievant with an opportunity to discuss his or her allegations with the Committee, either orally or in writing." (Bylaw 335.B.3.) "At this stage, the Committee may also give the administrator with authority to offer a remedy notice of the grievance and an opportunity to respond. To further facilitate its review, the Committee may also ask other persons involved in the events that gave rise to the grievance, including the department chair, to appear before or provide information to the Committee." (*Ibid.*)

If the P&T Committee "determines either that the grievant has not made out a prima facie case or that after a preliminary review, there is not sufficient reason to believe that the grievant's rights and privileges may have been violated, it shall advise the grievant to that effect in a written communication stating the reasons for its conclusion." (Bylaw 335.B.4, italics omitted.) But if "the Committee determines that the grievant has made out a prima facie case of violation of a right or privilege, and that there is sufficient reason to believe that the grievant's rights and privileges may have been violated, the Committee shall advise the Chancellor's designee of the grievance and the prima facie determination. The Committee shall make an attempt to promote a resolution of the controversy between the grievant and the administrative officer, officers, or other persons concerned. If no resolution can be reached, the Committee shall conduct a formal hearing." (Bylaw 335.B.5, italics omitted.) Such a hearing is conducted in accordance with the procedures set forth in Bylaw 335.D. The grievant bears the burden of proving the validity of the grievance by a preponderance of the evidence. (Bylaw 353.D.7.)

***The UCSF Grievance Process Satisfies Section 1094.5***

Section 1094.5's requirement of a "fair trial" does not mean that Dr. Chorba was entitled to a "formal hearing under the due process clause." (*Pomona College, supra*, 45 Cal.App.4th at p. 1730.) Rather, the words "fair trial" mean "that there must have been 'a fair administrative hearing.'" (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 96.) "[I]n assessing what process is due, a reviewing court must give substantial deference to the good faith judgment of the agency that its procedures afford fair consideration of a party's claims." (*Machado v. State Water Resources Control Bd.* (2001) 90 Cal.App.4th 720, 726.) A challenge to the procedural fairness of an administrative hearing under section 1094.5 is reviewed *de novo* "because the ultimate determination of procedural fairness amounts to a question of law." (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.)

The P&T Committee complied with the procedural requirements set forth above. When Dr. Chorba filed his first grievance, he was assigned a confidential contact to provide advice on the process in accordance with Bylaw 335.B.1. He submitted his original grievance on May 11, 2023, and submitted Parts 2 through 5 of his grievance on July 21, August 31, September 11, and September 23, alleging additional violations of his rights and submitting additional evidence. In sum, between May and September, Chorba submitted over 500 pages of documents to the Committee. In October, the P&T Committee notified Chorba his allegation of disability discrimination was going to be submitted to the Office for the Prevention of Harassment and Discrimination (OPHD) for review.

That same month, Dr. Chorba tried to add additional materials to his grievance. Shortly thereafter, a Senior Senate Analyst in the UCSF

Academic Senate (who kept Chorba updated and answered his questions throughout the process) informed Chorba that, in order to effectively conduct a preliminary review of the original grievance and make a decision, the Committee could not accept any more allegations or evidence. The Committee, instead, needed to focus on gathering information from other sources to determine if the grievance should proceed to a hearing.

In November, the P&T Committee interviewed a representative of CVRI (Guo Huang) regarding the Institute's hiring processes. It also spoke with a former chair of the space committee (Sri Nagarajan) and an analyst from the Committee on Academic Personnel (CAP). Having sent preliminary questions to focus the discussion, the Committee also spoke with Dr. Neil Powe in mid-December.

At that point, the P&T Committee noted as next steps: obtaining documentation from Dr. Powe regarding the chronology of efforts on Dr. Chorba's behalf; speaking to Chorba's mentor, Dr. Shokat; and then speaking with Chorba. Powe subsequently provided a timeline of events and some related materials.

The Committee interviewed Dr. Shokat in February 2024. Committee members' impressions after speaking with him were summarized for the record. The record also contained a sheet setting forth three options: "move to hearing"; "not move to hearing (provide chance for him to come)"; or "informal resolution?" (Italics & strikethrough omitted.) The move-to-hearing option was crossed out, indicating the Committee decided to hear

from Dr. Chorba before making a decision as to the need for a formal hearing.[8]  Chorba spoke with the Committee in April.

In mid-June, the P&T Committee sent an interim report to Dr. Chorba, advising that it was rejecting the bulk of his grievance allegations and that a more complete report explaining the Committee's reasons would be forthcoming.  The Committee sustained one alleged policy violation in connection with Chorba's failure to receive a timely appraisal as an assistant adjunct professor.  No action was going to be taken, however, since Chorba had changed professorial series and already been promoted.

Later that month, the P&T Committee issued its follow-up report stating the reasons for its rejection of most of Dr. Chorba's claims.  The report contained a table setting forth each of Chorba's numerous allegations, along with the Committee's specific rationale as to why it did not find sufficient reason to believe his rights or privileges had been violated.[9]

---

[8]  Dr. Chorba asserts the fact the move-to-hearing option was crossed out shows the P&T Committee violated its own process by deciding a formal hearing was unnecessary *before* he was given an opportunity to speak to it. Not so.  Bylaw 335.B.3 provides, "In the course of its preliminary review, the Committee shall provide the grievant with an opportunity to discuss his or her allegations with the Committee, either orally *or in writing*."  (Italics added.)  Chorba had already been afforded ample opportunity to submit written materials, and he availed himself, repeatedly, of that opportunity. He was not entitled to another, oral opportunity to discuss his allegations.  In any case, the document actually suggests the Committee was deciding whether to go directly to a formal hearing (with Dr. Chorba speaking in that forum) or to hear from him during their prima facie review, and it decided on the latter.  In short, the document does not suggest any procedural irregularity in the P&T Committee's assessment of Chorba's claims.

[9]  Dr. Chorba complains the Committee's language—that it did not find sufficient reason to believe his rights or privileges "had been" violated—did not track exactly Bylaw 335.B.4 which states, "If the committee determines . . . that after a preliminary review, there is not sufficient reason to believe that the grievant's rights and privileges *may have been* violated, it shall

40

The report also recommended consideration of mediation to identify long-term laboratory space that would allow Chorba adequate access to equipment, although it recognized "prior attempts to identify space and resources that Dr. Chorba considers adequate have not been successful and future mediation would require both a new look at space opportunities and realistic expectations for space and resources on behalf of the Chorba lab." Finally, in the event Chorba decided to seek employment elsewhere, the Committee recommended an agreement that UCSF would not "prevent or impede the transfer of otherwise eligible grant funding to any future institutions" and an agreement "regarding language for communications with potential future employers which would include an acknowledgement that the University was unable to provide long-term research space that satisfied Dr. Chorba's expectations."

Dr. Chorba filed his second grievance the next day, claiming his rights as both a faculty member and a citizen had been violated because representatives of UCSF and ZSFG had violated the Labor Code. The facts underlying the second grievance related to the same issues of lack of appropriate lab space, equipment, and institutional support that animated the first grievance. Several weeks later, the P&T Committee notified Chorba it had rejected this grievance at the prima facie stage because the policies he relied on were applicable to faculty discipline not faculty grievances. Since the allegations related to accusations of faculty misconduct, the Committee stated it would refer them to the UCSF Office of Ethics and Compliance.

There was nothing unfair or inadequate in the lengthy administrative

---

advise the grievant to that effect in a written communication stating the reasons for its conclusion." (Italics added.) This was a distinction without a difference, particularly given that the Committee's decisions largely turned on its interpretation of the policies Chorba invoked.

41

process afforded to Dr. Chorba. While he is plainly unhappy with the result, the P&T Committee followed UCSF procedures, thoughtfully considered testimony and evidence (including allowing Chorba a meaningful opportunity to be heard), and carefully responded to each of his allegations. Where the allegations involved areas outside of the Committee's purview, the Committee referred them to the appropriate campus authorities. With respect to the one violation it found pertaining to Chorba's consideration for advancement, it explained why no further action was necessary since he had already been promoted. And with respect to each of Chorba's remaining allegations, the Committee supplied specific reasons why it rejected them. Throughout the process, the Committee answered Chorba's questions and kept him informed regarding the status of his grievance. In sum, Chorba received exactly what he was entitled to—a fair administrative process.[10]

There is no merit to Dr. Chorba's complaint that the P&T Committee did not fully consider all of the evidence because it eventually refused to accept further submissions from him. Chorba cites no procedure which was

_____

[10] For the first time on appeal, Dr. Chorba claims his due process rights were violated because he did not receive a full evidentiary hearing, citing to Bylaw 335.D. He maintains he was entitled to such because he alleged violations of his fundamental right to pursue his profession. To begin with, Chorba forfeited the issue by failing to raise it in the trial court. (See *Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 548.) Further, in the analogous context of denial of tenure, courts have routinely held such claimed property or liberty interests do not trigger an entitlement to a full evidentiary hearing in an administrative proceeding. (See *King v. Regents of the University of California* (1982) 138 Cal.App.3d 812, 815 ["The unanimous conclusion is that a nontenured professor has no cognizable property interest in the renewal of [their] employment"]; *id* at p. 816 [decision not to award tenure did not deprive applicant of a liberty interest sufficient to trigger a full evidentiary hearing where he alleged his " 'good name' " had been " 'besmirched' " by the tenure decision]; accord, *Pomona College*, *supra*, 45 Cal.App.4th at p. 1730.)

42

violated by the P&T Committee in doing so. Nor could he, as during the preliminary review process, the Committee must only give the grievant the opportunity to discuss the allegations orally or in writing, and *may* request documents, as well as provide the responsible administrator an opportunity to respond to the grievance and ask other involved persons to provide information. (Bylaw 335.B.3.) Chorba not only submitted voluminous documents, but he also spoke to the Committee. The Committee additionally heard from several interested parties. In short, in declining to accept further documents from Chorba, the Committee did not give short shrift to his first grievance.

There is likewise no merit to Dr. Chorba's complaint about a passing statement in the administrative record. After Chorba was interviewed by the P&T Committee in April 2024, he sent an e-mail to the Committee Chair stating, among other things, that "it seems like there were a number of questions on the specifics of what I may or may not have access to, or the more granular details on what I can or cannot accomplish." He commented that he thought he had provided this information, and asked if the Committee would like an update. The Chair responded: "I have seen the list that you describe—this is one of the many, many documents that have been submitted related to this situation so I think it's unlikely that all committee members were intimately familiar with this list. Furthermore, I think what the committee is looking for is context associated with the list—i.e. with facile [*sic*] access to these three pieces of equipment (you can determine how to prioritize and the length of this list), I would be able to re-activate various grants. I suspect that such a clean answer is challenging, but whatever you can provide along these lines would be helpful for the committee."

Dr. Chorba asserts the Chair's comment that it was "unlikely that all

43

committee members were intimately familiar with this list" shows the members were unfamiliar with the evidence, and thus we should not presume the P&T Committee fully considered all of the evidence in making its determinations. Chorba reads far too much into the e-mail. That certain members might not have had the specifics of the list at their fingertips during Chorba's interview does not imply the Committee did not fully consider all available evidence before making its decision. Rather, as the Chair stated, it appears the members were looking for ways to translate the list into possible actions the Committee might be able to suggest as a means of resolving the dispute—i.e., some middle ground between all of the things Chorba asserted he lacked and what, at a baseline, might allow him to continue his research. In short, the e-mail appears to have been a positive attempt to try and focus Chorba on additional information that might be helpful under the circumstances.

Dr. Chorba's complaint that he was not allowed to present evidence in the *trial court* that Dr. Powe supposedly testified falsely before the P&T Committee is likewise meritless. As we have discussed, judicial review under section 1094.5 is generally limited to the record before the administrative agency. The only exception is spelled out in section 1094.5, subdivision (e), which allows a trial court to consider "relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent." And if such evidence is permitted, the trial court must remand the case for reconsideration by the administrative body in light of that new evidence. (*Ibid.*) Whether section 1094.5, subdivision (e) applies "is within the discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is manifestly abused." (*Pomona Valley*, *supra*, 55 Cal.App.4th at p. 101.)

44

There was no abuse of discretion by the trial court here. Dr. Chorba was entitled to a fair hearing by the P&T Committee, not a formal trial. If anything is abundantly clear on this record, it is that Chorba and Dr. Powe strongly disagreed with each other's positions. It was up to the Committee to sort out the conflicting evidence, and it did so. Moreover, the document Chorba sought to add to the administrative record was his personal commentary on Powe's veracity. As "[o]ur state Supreme Court has recognized . . . a lay witness's opinion about the veracity of another person's particular statements is *inadmissible* and *irrelevant* on the issue of the statements' credibility." (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239.) In short, there was no abuse of discretion by the trial court in refusing to accept Chorba's belatedly proffered credibility evidence.[11]

There also is no merit to Dr. Chorba's complaint about the Chancellor's involvement in the grievance process. When the P&T Committee issued its decision denying Dr. Chorba's first grievance, it made two recommendations—that the parties *consider* mediation to identify a long-term laboratory space for Dr. Chorba and that, *should Dr. Chorba decide to pursue employment elsewhere*, the parties agree not to impede the transfer of otherwise eligible grant funds and agree to language for communications with potential future employers. A copy of the decision was sent to the Chancellor's designee, but nothing in the administrative record shows any response by the Chancellor. Chorba claims this silence violated Bylaw 334.C and due process. Not so. That bylaw applies only to situations where, after a

---

[11] There likewise was no abuse of discretion by the trial court in refusing, at the *end* of the hearing on the merits, to continue the matter so Chorba could purportedly " 'prove false' " Powe's testimony to the P&T Committee.

45

formal hearing, the Chancellor gives notice of a tentative decision to disagree with the P&T Committee's findings. Here, the Chancellor did no such thing.

Finally, there is no merit to Dr. Chorba's complaint that UCSF Chief Campus Counsel advised the personnel who moved his lab, who denied his October 2023 request for indemnity, and who received a copy of the P&T Committee's grievance decision—collectively, according to Chorba, creating an unacceptable risk of bias. To begin with, Chorba forfeited this issue by failing to raise it in the trial court. (See *Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 548.) And even were we to consider it, Chorba has not alleged any *facts* suggesting Chief Campus Counsel was involved in the P&T Committee's decisions and that there existed an unacceptable probability of actual bias on the part of those who made those decisions. (See *Nasha v. City of Los Angeles, supra,* 125 Cal.App.4th at p. 483.)

### No Relief Available under Section 1085

Dr. Chorba also challenges the denial of traditional mandamus relief under section 1085. He maintains, contrary to the conclusion reached by the trial court, that the Regents have a clear, present, and ministerial duty to provide him the specific laboratory facilities and equipment referenced in certain federal grant proposals.

#### Statutory Framework and Standard of Review

A traditional writ of mandate lies "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station." (§ 1085, subd. (a).) To obtain relief, the petitioner must establish the existence of a public officer's or a public entity's " 'clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty.' " (*Crestwood Behavioral Health, Inc. v. Baass* (2023) 91 Cal.App.5th 1, 15.) " 'A ministerial act is one that a public functionary

46

" ' "is required to perform in a prescribed manner in obedience to the mandate of legal authority," ' " without regard to his or her own judgment or opinion concerning the propriety of such act.' " (*Monterey Coastkeeper v. California Regional Water Quality Control Bd., Etc.* (2022) 76 Cal.App.5th 1, 19.)  Thus, "the writ will not lie to control the discretion conferred upon a public officer or agency.  [Citation.]  The latter rule derives from the view ' "courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . ." ' " (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 741.)

"In ordinary mandate actions, an appellate court applies the same standard as the trial court." (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745.)  "The scope of review is limited, out of deference to the agency's authority and presumed expertise:  'The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.] . . .  "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support." ' " (*Ibid.*)  "Under the arbitrary and capricious standard, the question is whether the agency's action has a reasonable basis in law and a substantial basis in fact. [Citation.]  We defer to an agency's factual finding unless no reasonable person could have reached the same conclusion on the evidence before it." (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 595.)

### *No Clear Mandatory Duty*

Dr. Chorba points to his three 2020 NIH RO1 grant applications and the job announcement pursuant to which he was hired as the sources of UCSF's asserted duty to provide him the laboratory facilities and equipment

47

referenced in the grant proposals. None of these sources sets out any supposed duty sufficiently clear to permit issuance of a writ of mandate.

As we have recited, UCSF officials participated in the preparation of the NIH grant applications, certifying "that the organization will comply with all applicable assurances and certifications referenced in the application . . . [and] . . . that the applicant organization has the ability to provide appropriate administrative and scientific oversight of the project and agrees to be fully accountable for the appropriate use of any funds awarded and for the performance of the grant-supported project or activities resulting from the application." (See NIH Grants Policy Statement § 2.3.6; see also *id.,* § 2.1.2.)

Dr. Chorba claims "[e]ach application included detailed descriptions of the facilities, laboratory space, equipment, other resources, and environment that UCSF promised to provide." This simply is not the case.

The RO1 grant applications, which were executed by UCSF staff in 2020, described the research environment at UCSF generally, the history of grants previously received, the quality of faculty and research, and the Mission Bay Campus. They stated that Dr. Chorba's "research will be performed in the laboratory of Prof. Kevan Shokat on the UCSF Mission Bay Campus until his transition to independence is complete." And they further stated Chorba had access to the extensive equipment available "in Dr. Shokat's laboratory." In an October 2020 letter of support of the applications, UCSF advised the NIH: "Regarding laboratory space, by the time of activation of this award, John will be provided the appropriate independent laboratory space for his staff in the vicinity of his mentor, Dr. Shokat, to facilitate his transition to independence. In 2023, we will open a state-of-the-art Research Building at [ZSFG], where we will consolidate laboratory

48

research on the campus." The letter went on to state Chorba's research program has been included in the planning for the new research building and that Dr. Shokat would "continue to provide [him] access to his . . . laboratory, and the resources therein."

In short, the grant applications say nothing with respect to the specifics of any laboratory or equipment that would be provided to Dr. Chorba after his transition to independence. And the October 2020 letter explained Chorba would be provided the "appropriate independent laboratory space for his staff in the vicinity of his mentor, Dr. Shokat" until 2023, when he would move to Pride Hall. Thereafter, Shokat would continue to provide Chorba access to his laboratory and resources. While these documents can be said to create a duty on the part of UCSF to provide "appropriate" lab space and equipment, they certainly do not, either singly or collectively, create any clear duty to provide specific laboratory space and equipment.

The same is true of the advertisement for his faculty series appointment in the Department of Medicine. It stated only that "[o]utstanding research space and generous start-up packages will be provided" to successful applicants. It said absolutely nothing about specific space or equipment.

Even assuming an obligation to provide an "appropriate" or "outstanding" laboratory, doing so necessarily involves both subjective assessment and the exercise of discretion. Thus, by definition, such an obligation is not a mandatory duty under section 1085 that can be compelled through ordinary mandamus.[12]

---

[12] Dr. Chorba has stressed throughout these proceedings a statement made by UCSF staff in several of his 2024 grant proposals that " '[t]he facilities and equipment described for and required to execute the projects with current NIH funding exist at UCSF but are currently not readily

Dr. Chorba's citation to *Sego v. Santa Monica Rent Control Bd.* (1997) 57 Cal.App.4th 250, 255 (" 'While mandamus will not lie to compel governmental officials to exercise their discretionary powers in a particular manner, it will lie to compel them to exercise them in some manner.' ") and *Sheperd v. Superior Court* (1976) 17 Cal.3d 107, 118, overruled on other grounds in *People v. Holloway* (2004) 33 Cal.4th 96, 131 ("While mandate does not normally lie to control the exercise of discretion, it is nevertheless 'appropriate to compel an officer both to exercise his discretion and to exercise it under a proper interpretation of the applicable law.' "), are unavailing. This is not a case where UCSF did not act at all and thus did not exercise its discretion. To the contrary, UCSF *did* exercise its discretion by assigning Chorba space and equipment in Pride Hall, and Chorba's dispute with UCSF is over *how* it exercised its discretion—which is not a basis for relief under section 1085.

## DISPOSITION

The judgment is affirmed. The Regents are entitled to their costs on appeal.

---

available to Dr. Chorba.' " Chorba seems to believe these statements show both that UCSF knows what adequate lab space is and that it has failed in its ministerial duty to provide it to him. We disagree. By 2024, Chorba's lab was located at BCH Oakland at his request. *He* informed UCSF that the lab space there was inadequate (although less inadequate, in his view, than the Pride Hall space). UCSF's statement is presumably referring to the Pride Hall space—which it found adequate but which Chorba rejected—while also accepting Chorba's opinion that the BCH Oakland space is inadequate for his needs. If anything, this shows that reasonable minds can differ about the adequacy of any particular lab space in the present context, making relief under section 1085 (requiring a clear duty) unavailable to Chorba.

_____
                        Banke, Acting P. J.

We concur:

_____
Langhorne Wilson, J.

_____
Rodriguez, J.*

*Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A172615, *Chorba v. The Regents of the University of California*